UNITED ARTISTS CORPORATION,
Appellant,

v.

STRAND PRODUCTIONS, Inc., and Ressan Incorporated, Debtors,
Appellees.

STRAND PRODUCTIONS, Inc., and Ressan Incorporated, Debtors,
Appellants,

v.

UNITED ARTISTS CORPORATION,
Appellee.

No. 13631.

United States Court of Appeals
Ninth Circuit.

Oct. 15, 1954.

Wright, Wright, Green & Wright, Loyd Wright and Charles A. Loring, Los Angeles, Cal., for appellant United Artists.

Reynolds, Painter & Cherniss, Louis Miller, Los Angeles, Cal., for appellant Strand Productions.

Before STEPHENS and CHAMBERS, Circuit Judges, and WALSH, District Judge.

CHAMBERS, Circuit Judge.

The questions here arise out of two motion picture contracts bearing dates of March 18, 1948, and June 9, 1948, wherein United Artists Corporation, a Delaware company, is the distributor. Under one, James Nasser Productions, Inc., is the producer and under the other James Nasser individually is the producer.

Strand Productions, Inc., and Ressan, Incorporated, debtors, have succeeded to the Nasser interests. In all respects material to this cause, the substance of the contracts is identical.

Throughout this opinion, United Artists Corporation will be referred to as "United" or "the distributor." For discussion purposes, the original producers will be referred to as "Nasser" or "the producer." The debtors in bankruptcy (Chapter XI) will also be referred to as "the producer," "the debtor" and as "Strand." "Strand" will encompass both Strand Productions, Inc., and Ressan, Incorporated.

Each contract contains 39 printed pages plus several addenda pages. By the terms of the contracts, Nasser undertook to make four feature motion pictures and United agreed to distribute them. Apparently, United is a major distributor, but not a major producer. It restricts its business to distribution of pictures made by others. It is not doing violence to the contentions of either side to say that, at least by volume of content, the contracts concern themselves primarily with distribution of pictures for exhibition in motion picture theatres, containing a great mass of clauses concerning such distribution, evidently worked out and accumulated through the years. The television clauses of the contract are relatively short, but in them is the source of this litigation.

A table of pictures showing (a) the original contract name and (b) the name under which the picture was released, together with the release date, is as follows:

| Name of Picture | Date Released |
| --- | --- |
| 1. a. Innocent Affair | |
| b. Don't Trust Your Husband | October 15, 1948 |
| 2. a. Some Rain Must Fall | |
| b. Cover Up | March 11, 1949 |
| 3. a. Joe Macbeth | |
| b. Without Honor | October 21, 1949 |
| 4. a. Caesar the Great | |
| b. A Kiss for Corliss | November 29, 1949 |

A better understanding of the case may be gained if at the outset it is stated that at the time of the trial of the facts below it appears that the major motion picture producers, since the development of the television industry, have adopted a policy of not releasing to television their films originally or currently made for theatre exhibition, although about all have produced new films for television alone.

It seems that United, as a distributor, has attempted to follow, with a few exceptions, the practices of the major producers who ordinarily do their own distributing.[1] Therefore, the television industry has been largely dependent, for film stories, upon old films not in the hands of United and the major producers, or upon new films produced exclusively for television.

It is evident that if the debtor Strand can get its four pictures free from the United contract, quick cash can be had from television exhibitors for its creditors.

Identical portions of the contract upon which this controversy turns are as follows:

"Grant

"Producer grants to United and United accepts from Producer the sole and exclusive right, license and privilege to exploit, distribute, exhibit and market, and cause to be exploited, distributed, exhibited and marketed the motion pictures specified herein in all gauges throughout the world, and particularly in the territories set forth in Schedule 'B' hereto attached. Such grant includes the following in addition to any other right which may be set forth herein:

"a) the right to sub-license;

"b) the right to broadcast and televise such parts of any such motion picture as United may deem advisable for the purposes of exploitation and advertising, provided Producer owns such right. All other broadcasting and television rights of every kind and character are reserved by Producer, except as provided elsewhere herein;

"c) the sole and exclusive license under the United States copyright and any other copyright to exploit, distribute, exhibit and market the motion picture so copyrighted and the sole and exclusive right to license others under said copyrights.

"Period of License

"The period of license hereunder for each motion picture in each territory is five (5) years from the date of general release of that motion picture in that territory. But in any event the term of the grant and the period of the license shall terminate and come to an end seven (7) years from the date of general release in the United States of America.

\*　　\*　　\*　　\*　　\*　　\*

"Television

"The parties hereto agree that television may require a new method, manner or system of marketing

---

1. Some, but not all, of the major producers distribute for independent producers.

motion pictures. Accordingly, United agrees with respect to such motion pictures as to which Producer owns the necessary television rights United will market such motion pictures in relation to television in the same manner and under the same method as may be from time to time adopted by other major motion picture distributors and at rates approximately not less favorable to Producer than those from time to time adopted by other comparable television distributing agencies. If and when television shall become a commercial practice and United shall not then acquire the necessary facilities with which to market motion pictures in the television field in a manner favorably comparable to its present-day standards of distribution, then Producer shall be privileged to dispose of its television rights in the motion pictures to any other party.

\* \* \* \* \* \*

"United's Obligations

"United agrees to devote its best efforts to the proper marketing and disposition of the motion pictures delivered hereunder in all the territories wherein it customarily markets motion pictures and to make such marketing as complete and efficient as practicable so that the gross returns from the marketing of the produce hereunder shall be as large as possible and at the same time consistent with the sound business policy of United.

\* \* \* \* \* \*

"United's Default

"In the event United violates any of the promises, covenants and obligations to be kept and performed by United pursuant to this agreement, United shall have thirty (30) days in which to rectify such violation and comply with this agreement after the mailing of a written notice by Producer setting forth such violation in detail by registered letter sent by Producer to United at the office of United, 729 Seventh Avenue, New York City, and the President of United, and until after the expiration of said thirty (30) days United shall not be in default. No proceeding shall be brought claiming any remedy for any alleged breach unless such notice shall have been given as herein provided.

\* \* \* \* \* \*

"Warranty

\* \* \* \* \* \*

"Producer further warrants and represents that it has not and agrees that it will not at any time grant or attempt to grant to any person, firm or corporation rights of any kind or character, the exercise of which will derogate from or compete with the rights granted or agreed to be granted to United hereunder."

The contract has bankruptcy clauses which need not be quoted for the reason that the distributor, United, is not bankrupt, and so far as the producer is concerned the clauses address themselves only to the situation of bankruptcy prior to the release of the film; that is, they are concerned with bankruptcy of the producer while he is producing the film.

The Strand-Ressan (herein called Strand) proceedings are under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. Therefore, no trustee has been appointed.

Successive petitions in behalf of the debtor were filed before the referee in bankruptcy wherein relief was sought as against United. By the first petition, Strand sought a determination that the television rights (the right to sell the films to television broadcasters) were free and clear of the distribution contract and that United had no interest in the television rights. Under the second petition, Strand, upon the alternative assumption that the television rights were under the contract, sought to have United's rights for such distribution of the films terminated as wholly executory and

as a severable portion of the contract. United opposed both petitions.

A hearing was held before the referee and a considerable volume of evidence, oral and documentary, received. The referee upheld the contentions of Strand upon both petitions. The district court at first reversed the referee on both petitions, holding for United. Upon reconsideration, the district court upheld the referee on the first petition, ruling that the bankrupt debtor was free to sell the films in the television market. However, the district court continued in force its ruling reversing the referee on the second petition, holding that the debtor was not entitled to treat the television provisions as separate, severable and terminable in bankruptcy proceedings as executory. Of course, the debtor did not need to succeed on both petitions to get the films on the television market. Success on one is enough.

United has appealed the district court's order on the first petition. Strand has cross-appealed the order against it on the second petition.

The parties are in agreement that television at the date of the making of the contracts was in the laboratory or experimental stage. How it would develop as an industry was only a guess. It was generally felt that it would materially affect the motion picture industry, but how was not clear. There was some thought that the development of television might result in the televising of films from Hollywood or some other point to the established theatres, eliminating the enormous operation of shuttling films about the country. Then there were dreams of broadcasting films to homes of "subscribers" to a motion picture service. Some had the thought that films could be broadcast to homes on a sort of vendomatic receiving basis— perhaps a dime slot for Paramount, a second for Warner Bros. and a third for United. It is easy to criticize the draftsman of a contract in the afterlight of experience with a new development.

However, the television clauses of the subject contract, though we make due allowance for the status of television at the time, seem still to be poorly constructed compasses for a voyage into the unknown. They seem not carefully thought out, but more the language of "sales" or "promotion." Counsel for United and Strand interpret them with ease, but totally differently. Here they must be judicially interpreted and, if either or both suffer a loss as a consequence thereof, the signers of the contract have only themselves to blame. This court, as did the district court and the referee, will do the best it can.

The referee received oral testimony from Arthur B. Krim, president of United, on a "for what it is worth" basis, reserving the tests of admissibility, competency and materiality until a later day. Much of his testimony is an argument as to his interpretation of the contract. George L. Bagnall, the vice president of United, who signed the contracts for United, appeared as a Strand witness. (In a change of management Bagnall has left United Artists and Krim has come in.) Bagnall was not permitted to "interpret" the contract but was closely restricted in his testimony. Undoubtedly considerable testimony was necessary to show current marketing conditions and practices in the industry and to show the status of the subject films in current distribution to determine whether certain conditions had occurred or what performance there had been made in the distribution.

However, this court concludes the referee was correct when he held the contract is not so constructed that parol evidence should be received to explain it.[2] It gives no indication of clauses in it by mistake, of errors, of omissions or of ambiguous language. Kunihiro v. Lyons Bros. Co., Cir. 9, 12 F.2d 894; Big Boy Drilling Corporation, Ltd. v. Etheridge, 44 Cal.App.2d 114, 111 P.2d 953; Goldstein v. Frances Emblems, Inc., 269 App.Div. 345, 55 N.Y.S.

---

2. The district court impliedly upheld the referee's rulings on the evidence.

2d 740; Courtright v. Dimmick, 22 Cal. App.2d 68, 70 P.2d 269. And the case being one essentially for construction of language within the four corners of the instrument, the appellate court is free to interpret the contract without indulging presumptions as to the interpretation below. As logic, the conclusions are entitled to serious consideration, but the appellate court is not bound thereby. Crosley Radio Corporation v. Dart, 6 Cir., 160 F.2d 426; Erskine v. United States, 9 Cir., 84 F.2d 880.

The producer picks up the third sentence of the television clause and argues that, television having become a "commercial practice," the literal, technical meaning is that the producer can go its way and sell the films to the television industry. But even the producer has to do a little implying or interpolating by adding "and use" to make the sentence read as follows:

"If and when television shall become a commercial practice and United shall not then acquire [and use] the necessary facilities with which to market the motion pictures in the television field in a manner favorably comparable to its present-day standards of distribution, then Producer shall be privileged to dispose of its television rights in the motion pictures to any other party."

But if the literal approach is to be made, it would be just as valid to adopt one approach of United and say United complied with the condition when it set up its own television distribution agency without going further and distributing the films in television.

And if just a little interpolating is to be done, it seems just as reasonable to interpolate for United after "commercial practice" the words it asks to interpolate, "as to pictures made originally for theatre exhibition" (because the subject of the contract, not directly expressed, was pictures made originally for theatre exhibition), and have the clause read as follows:

"If and when television shall become a commercial practice [*as to films made originally for theatre exhibition*] and United shall not then acquire the necessary facilities with which to market the motion pictures in the television field in a manner favorably comparable to its present-day standards of distribution, then Producer shall be privileged to dispose of its television rights in the motion pictures to any other party."

In interpreting the contract, of course, the first rule to be observed, in the light of what the parties were trying to accomplish, is to try to give meaning to all parts of the document. However, all parts should be treated together, if possible. 17 C.J.S., Contracts, § 297, p. 707; 12 Am.Jur. 772; Restatement of Contracts, §§ 235(c), 236(a).

Attempting to consider the contract as a whole and to give a reasonable construction to it, this court is of the opinion that the television paragraph is susceptible of being interpreted and should be interpreted as follows:

(1) In the second sentence of the television clause where it is said, "Accordingly, United agrees that with respect to such motion pictures as to which Producer owns the necessary television rights," it should be held that the parties were referring only to the four pictures under the two contracts between Nasser and United. (Both parties apparently would agree to this.)

(2) In the second sentence where it is said, "United will market such motion pictures in relation to television in the same manner and under the same method as may be from time to time adopted by the other major motion picture distributors," etc., it should be held that United is to follow the policy of the majors as to releasing films of one character and not releasing films of another character, as well as other distribution policies, and the words are not to be restricted to such details as how films are shipped about

the country or how collections or charges to the exhibitors are made.

(3) The third sentence concerning "commercial practice" and the setting up of a marketing organization is dependent upon there being a duty of United (as determined by the policy of the major distributors) under the first two sentences of the television clause to market the four pictures. In other words, the interpretation is: "If and when television shall become a commercial practice [*and United has a duty to market the films*] and United shall not then acquire the necessary facilities with which to market the motion pictures in the television field in a manner favorably comparable to its present-day standards of distribution, then Producer shall be privileged to dispose of its television rights in the motion pictures to any other party."

The constructions indicated seem to make sense in the following respects:

1. The underlying thought of the agreement seems to be to follow as to the subject pictures the practice of the major producers who are, in fact, with United, the major distributors.

2. It makes United's duties and its privileges co-extensive; that is, if the major producers as a policy are putting certain films simultaneously into theatres and television, United has a right and a duty to do the same with producer's four pictures. The only natural construction to this court of the television paragraph is that unless the other major producers are putting a substantial portion of their pictures simultaneously or successively into the theatres and television, United has no right to do so. (Dual distribution in the instant case here might aid the producer, but under other circumstances, say at the outset of theatre distribution, placing the pictures in television could have hurt the producer and he should have had the right to stop the practice if the "majors" weren't doing it.) To give United little rights under the first two sentences of the television paragraph, but to let the producer out under the third sentence,

is a result so unfair that it should be avoided if possible. Therefore, it seems reasonable to interpret the contract to mean the producer cannot cut the heart out of the contract for United's not doing something United has had no duty to do and probably no right to do.

3. The court's interpretation of the whole contract is fortified by the last sentence of the warranty clause quoted above, which is as follows:

"Producer further warrants and represents that it has not and agrees that it will not at any time grant or attempt to grant to any person, firm or corporation rights of any kind or character, the exercise of which will derogate from or compete with the rights granted or agreed to be granted to United hereunder."

The court believes that the clause has teeth in it. The producer by that clause, it would seem, is obligated with respect to the four pictures to do nothing to United which would hurt United in its distribution of these pictures or United in its general business of distributing. This is not to say that the producer, with respect to other pictures not under contract to United, must treat United as a privileged character.

 Relying on United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, and Kiefer Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L. Ed. 219, Strand asserts that if the contract is interpreted so as to let, in the vernacular, the major producers call the shots, then there is a violation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq. United answers this contention, and the court thinks correctly, with the suggestion that for a contract to be held illegal as in restraint of trade, the combination must rest upon an understanding or agreement between actual competitors.

 The evidence in the case would indicate that United and a lot of other people in the motion picture industry, in the formulation of policies, are to

some considerable degree at the mercy of the major producers. The major producers may or may not be adopting policies with reference to television and motion picture theatres which are in restraint of trade, but it would not appear that the contracts here at issue attained illegality by virtue of the television clause which provides the policies of the major producers would be adopted, United and Strand not being competitors.[3]

As to the cross-appeal of Strand, if the contract is divisible, then Strand has a strong basis for relief under the Bankruptcy Act when it seeks to remove the television distribution from the contract as executory. This court is of the opinion that on the whole the contract is not one for the sale of a load of corn and a load of wheat, where the two items are in a contract by coincidence and where the corn is just like thousands of other loads of corn and the wheat like thousands of other loads of wheat.

 Distribution through theatres was the dominant object. A cutting out of a segment of distribution which would hurt or which reasonably might hurt United, as to these pictures or as to its overall business, is not to be countenanced when the whole distribution is intertwined as it is. This being so, the contract should not be held divisible as to television exhibition. So it must be held that the contract is not properly the subject of executory relief under the Bankruptcy Act. Therefore, this court will not disturb the district court's ruling on the second petition wherein a release was sought on the ground that television rights were executory.

The order of the district court is reversed insofar as it held that as of the date of its order Strand was entitled to put the four pictures in question into the television market. Any new order should be made in accordance with this opinion. However, it is recognized that the period of United's license may have expired absolutely, at last, by the lapse of time. If that be true, the district court may take cognizance thereof.

---

3. In the proceedings before the referee and the district court, there seems to have been no issue made by Strand that the basic contract was illegal as in restraint of trade. The issue is not included in the notice of points of Strand to be relied upon in appeal, and it is not the subject of specification of error.

Strand introduces the matter on appeal by simply saying that one of the common rules of construction of contracts is that a court should favor a construction which makes a contract legal rather than one which makes it illegal.