**MILWAUKEE TOWNE CORPORA-
TION, Petitioner,**

v.

**LOEW'S Incorporated et al.,
Respondents.**

**No. 48 C 1038.**

United States District Court
N. D. Illinois.
March 29, 1956.

Thomas C. McConnell, Chicago, Ill., for Milwaukee Towne Corp.

Miles G. Seeley, Bryson P. Burnham, Richard F. Hart, Chicago, Ill., for Loew's Incorporated, RKO Radio Pictures, Inc., Columbia Pictures Corp. and Warner Bros. Pictures Distributing Corp.

Edward R. Johnston, Samuel W. Block, Leon Fieldman, Chicago, Ill., for Paramount Pictures, Inc.

Francis E. Matthews, Robert W. Bergstrom, Chicago, Ill., John F. Caskey, New York City, for Twentieth Century-Fox Film Corporation.

Vincent O'Brien, Chicago, Ill., Stuart H. Aarons, New York City, for Warner Theatres, Inc., and Stanley Warner Management Corp.

James P. Carey, Jr., Chicago, Ill., Special Master.

HOFFMAN, District Judge.

The original injunctive decree in this private antitrust action was entered on April 14, 1950. The decree was modified in accordance with the opinion of the Court of Appeals, 7 Cir., 190 F.2d 561, on January 25, 1952. An order interpreting the original decree was entered on June 10, 1953, in accordance with the opinion of the Court of Appeals, 7 Cir., 201 F.2d 19. The decree was further modified on December 21, 1953, on agreement of all the parties. On June 8, 1954, the plaintiff (petitioner here) filed this petition for a rule to show cause why the defendants (respondents) [1] should not be

---

1. As a matter of convenience, the court has used the term "defendants" in referring to the six film distributing companies and the Warner exhibiting companies, all of whom were parties to the original suit. The Fox company which directly operated the "Fox" threatres in Milwaukee was not a party to the decree,

held in (civil) contempt for violation of the original decree as modified. The period covered by the record in this case is the years 1952–54.

Pursuant to Rule 53(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the matter was referred to Special Master James P. Carey, Jr., who took the evidence and prepared a report incorporating his findings of fact and conclusions of law. The Master found the issues in the defendants' favor. The petitioner filed objections to the Master's report, and a full hearing was had before this court. All of the evidence before the Master was documentary; no testimony was taken. The parties do not dispute the validity of the facts in evidence, but they draw sharply different conclusions from them.

While the petition for a rule to show cause, the Master's findings and the objections thereto cover several different issues, there is, as the court interprets this record, only one major (and one minor) ground upon which the alleged contempt is predicated—and that is the employment by the defendants of competitive bidding in a manner violative of Section V(b) of the decree. All of the more detailed findings and objections are simply particularized aspects of this central problem.

■ Brief reference may be had to the one activity complained of which is distinct from the problems raised by competitive bidding. The petitioner alleged that the distributors "staggered" the release of their films in such a way that they did not compete with one another in licensing pictures for first-run exhibition. The Master found no evidence to support the charge, and the court must agree. The exhibits which are said to reveal "staggering" are Pl. Ex. 1–6, which list all of the release data on pictures distributed by each of the six distributors, and Loew's Ex. 2, which is a composite list in chronological order of the films released by all six of the distributors. Hundreds of films were offered for exhibition during the 1952–54 period, and six (sometimes seven) theatres were playing first run in the downtown area. In the natural course of events films of the several distributors would become ready for release at different times, and of course playing dates would have to be adjusted to the availability of the theatre or theatres interested in showing the film. A considerable amount of "staggering" both in offering dates and in play dates seems inevitable. The petitioner has not pointed out a pattern of release which would demonstrate deliberate non-competition on the part of the distributors. If there is such a pattern, it eludes the court.

Section V(b) of the decree provides that the defendant distributors and exhibitors are perpetually enjoined from:

"preventing plaintiff, in the operation of the Towne Theatre in the City of Milwaukee, Wisconsin, from contracting for or from securing in the course of interstate trade and commerce, at fair and reasonable film rental, any motion picture film or films suitable for first-run exhibition in the City of Milwaukee, Wisconsin, by refusing to offer such picture to plaintiff at such fair and reasonable film rental."

This provision has previously been a subject of dispute between the parties. In 1952 the defendants sought a judicial interpretation of the provision. Specifically, defendants asked for an order saying that Towne was not entitled to a competitive position superior to that of any other exhibitor, but, in effect, they also sought approval of competitive bidding. In interpreting Section V(b), the Court of Appeals said that it was its belief that "competition would be the yardstick for determining a fair and reasonable rental." 201 F.2d at page 23. It continued:

"In summary, we reiterate our previous holding that plaintiff is en-

but was a wholly-owned subsidiary (through an intermediate subsidiary) of the defendant Twentieth Century-Fox Film Corporation.

titled to the same competitive position which it would have occupied absent a conspiracy and that it has no right to the award of a position superior to that of its competitors. Thus, *we interpret a 'fair and reasonable film rental' as provided for in Section V(b) of the decree to mean a rental determinable by competition.* The decree is silent as to the system or method to be employed in making such determination. To now specify a system or method would require a modification of the decree, which neither the District Court nor this court is called upon to make. It devolves upon the defendants, whatever system or method is utilized, to make certain that plaintiff in the procurement of pictures is afforded *every opportunity, right and privilege accorded a competitor, that and no more."* 201 F. 2d at page 25; emphasis added.

This court, on June 10, 1953, entered a judgment order interpreting the decree in substantially the same language used by the Court of Appeals.

From time to time during this proceeding petitioner has directed a broadside attack at competitive bidding, arguing that it is not productive of fair and reasonable film rentals and that the system itself constitutes a violation of Section V(b) of the decree. While not always expressed, the theory behind this position is that the Towne, as a bulwark of independence in Milwaukee first-run exhibition, was to be guaranteed the right to stay in business—that is, to obtain films at a price which it could afford to pay. In other words, the competitive picture in Milwaukee and the nature of the alliance between the defendant distributors and exhibitors requires the presence of a healthy independent in order to avoid the realization of the original objective of the conspiracy—monopolizing first-run exhibition for the Fox and Warner theatres (which were then affiliated theatres). Competitive bidding is unlikely to preserve the independent as, it is claimed,

has been demonstrated by this record, because Fox and Warner, as part of a nationwide chain, can afford to bid prices which the independent cannot meet, thus forcing it out of business. There is considerable evidence that Judge Barnes, who presided at all of the earlier proceedings in this litigation, held this view and for that reason would not approve competitive bidding. But however much merit there may be to the petitioner's general opposition to competitive bidding, we believe that the Court of Appeals has precluded this court from condemning the system as a whole, even on this record. The petitioner emphasizes a statement from the Bigelow opinion (Bigelow v. Loew's, Inc., 7 Cir., 201 F.2d 25, a decision rendered on the same day as Towne and involving interpretation of an identical provision) in which the Court of Appeals said:

"It can be said, however, that there is nothing in the decree, either in the Towne or the instant case, which either requires or prohibits the distributors from utilizing a system of bidding as a means of determining a 'fair and reasonable film rental.' *In any event, it is the end result and not the system employed which is important."* 201 F.2d at page 28; emphasis added.

But to focus attention on the language of "fair and reasonable film rental" is to ignore the underlying principle of the Towne and Bigelow decisions. The crucial holding was the manner in which a fair and reasonable film rental was to be established (and judged by the courts) —that is, by the operation of competition. It seems to the court that the only limitation on the defendant distributors, as a result of these decisions, is that they offer films to all exhibitors without discrimination in an atmosphere of free and open competition. If this is done, the resulting film rentals *are* the fair and reasonable rental required by the decree. Thus, operating losses of the Towne and the increased film rentals it pays—standing alone—do not

show that films are being offered at unfair or unreasonable rentals. To state it bluntly, the Court of Appeals would permit the Towne to be forced out of business if this resulted only from natural competitive forces. So far as this record shows, the Towne has been offered the same right and opportunity to bid as its competitors.

The petitioner's contentions in this proceeding, however, go beyond a general condemnation of competitive bidding. What it is saying, if we may rephrase it in the language used here, is that the prices are not being determined in an atmosphere of free and open competition. Rather, the defendants—distributors and exhibitors—are manipulating the system to force up the cost of film rentals to an artificial level at which petitioner's losses will force it out of business. This would, in petitioner's view, achieve the goal of the original conspiracy—to confine first-run exhibition to the Fox and Warner theatres—, and it is possible because the much greater resources of the Fox and Warner chains enable them to operate at a loss until the goal is realized. The court agrees that if the petitioner's evidence supported this charge, a violation of the decree would be shown.

There are two ways in which petitioner could sustain this charge. The first would be to produce direct evidence of either a specific design on the part of each of the defendants individually or a joint plan of action to utilize competitive bidding in the manner charged. The former would constitute a violation because the decree operates against the defendants or any one of them. Not surprisingly, however, there is no direct evidence of individual or group design. The petitioner could also sustain its charge by pointing to facts so striking that they can lead only to the inference that the defendants cooperated

(that is, conspired) to employ competitive bidding in the manner and for the purpose charged. This is what the petitioner has attempted to do. It requires an analysis of the facts on which petitioner relies and of the inferences which they support.

The principal facts on which petitioner relies are that all of the first-run downtown theatres in Milwaukee [2] operated at a loss during the period when competitive bidding was in effect and that film rentals (which are given as a percentage of total box office receipts) increased substantially under competitive bidding. The petitioner also claims as evidence of its charges the requirement of minimum percentage terms or guarantees by the distributors on some films, the rejection of all bids offered on some films and subsequent negotiation of the license at a higher rental and the occasional adjustment of a film rental in favor of a Fox or Warner theatre after the picture had played.

It is not entirely clear from the record when the system of competitive bidding was first put into effect by the defendant distributors. The petitioner contends that it was initiated in the summer of 1948 and continued thereafter except for one period in 1952. It is conceded, however, that during a period from May or June 1952 to approximately January 1953 (the exact dates varied from distributor to distributor), the Towne was on a "first refusal" basis—that is, the distributors offered films to Towne first without a bid, and only after Towne had expressed no interest did they offer the films for bidding to the other theatres. After the Court of Appeals decision interpreting Section V(b) of the decree, the distributors included Towne in competitive bidding. Thus, the competitive bidding at issue in this case continued from January or February 1953 to the end of

2. These threatres are the Towne (petitioner), the Riverside (which was during the period relevant here an independent), the Wisconsin and Palace (Fox threatres) and the Warner and Alhambra (Warner threatres). A seventh, the Strand (Fox), operated part of this period on first run but is generally not included in the analysis.

1954, which is as far as the record goes.[3]

The petitioner claims that this seven to eight month period was the only time during which the distributors were licensing films to Towne at a fair and reasonable rental, and it relies heavily on a comparison of this period with the one that followed. The evidence shows that in the six month period from June 27 through December 31, 1952, the petitioner's operation showed a profit. Thereafter (coinciding more or less with its subjection to competitive bidding) the petitioner operated at a loss. It is also pointed out that the Towne's film rentals averaged about 29% of gross box-office admissions between June 25, 1952, and February 3, 1953. Thereafter, beginning with competitive bidding, its film rental jumped to an average of 44.1%. All of this is said to show the difference between fair and reasonable film rentals and artificially inflated rentals. There are at least two reasons why this comparison is not persuasive. Loew's Ex. 4 shows that in the period June 27 through December 31, 1952, the Towne's total box-office receipts ran considerably higher than during any other six month period from 1952 through 1954. In terms of weekly averages, the average for this period was almost $1,200 per week higher than that of the second highest six month period. Since the amount taken in at the box office is the central fact in a theatre's profit picture, it is not surprising that the Towne showed a good operation during this period. As for the Towne's percentage of film rental during this period, the court does not see how it can be considered conclusive as to what constitutes a fair and reasonable rental. It must be remembered that the Court of Appeals said that a fair and reasonable rental must be determined by competition. But the

Towne was not competing then. It was being given the first choice on films without reference to what other competitors might pay and before any of them had expressed themselves. This figure of 29% exists in a competitive vacuum and, taken alone, does not tell us much.

The petitioner also relies on the overall operation of the first-run theatres under competitive bidding. By and large, all of the first-run theatres in Milwaukee operated at a loss from 1952 through 1954. Film rentals paid by the theatres from February 1953 on averaged from 40 to 43% (44.1% for the Towne). It is petitioner's contention that this shows that the Fox and Warner theatres were bidding—and being compelled by the distributors to bid—exorbitant film rentals, which the Towne had to meet, in order to eliminate the Towne as a competitor. The defendants maintain that the profitless operation was due largely to a slump in the exhibition business. The evidence clearly shows a business decline. A comparison of average weekly box-office receipts for four of the first-run theatres (Loew's Ex. 3 and 4) shows the following:

| Theatre | 12-26-46 to 7-19-48 | 7-20-48 to 4-27-49 | 1952–54 |
|---|---|---|---|
| Towne | $ 7,245.46 | $ 8,945.67 | $ 7,488.56 |
| Wisconsin | 12,658.35 | 11,087.99 | 8,877.77 |
| Palace | 11,826.51 | 10,827.85 | 5,901.02 |
| Warner | 11,077.75 | 11,873.43 | 8,473.46 |
| Total | $42,808.07 | $42,734.94 | $30,740.81 |

In examining the Towne figures, it is important to keep in mind that because of the operation of the conspiracy Towne was not able to obtain first-run films from any of the defendant distributors from 1947 to July 1948; and from July 1948 to May 1949 it obtained films from only two of them. The difference of $12,000 per week in total receipts is particularly relevant in showing the

3. Actually, the damage period runs from February 1, 1954, to the end of the year. This is apparently due to the fact that petitioner executed covenants not to sue (which are not in the record) covering the period prior to February 1954. It is necessary to consider evidence predating February 1954, however, in order to get a complete picture of how competitive bidding was operating.

drop in theatre attendance between 1949 and 1952. The Towne's receipts also showed a decline within the 1952–54 period. It took in approximately $51,000 less in the year May 1953 to May 1954 than in the previous yearly period.

The analysis of Towne's operations during 1952–54 (see pp. 22–23 of Master's Report) is also illuminating. It shows that in more than 50% of the playing weeks the Towne did not gross enough to meet its "break-even point" even at a 25% film rental. Despite the overall pattern of losses, however, the film by film analysis of profits and losses for the theatres (Pl. Ex. 7–12, 14) shows that each of them was able to realize a profit on certain individual films, which apparently were the outstanding ones shown during the period and were capable of attracting enough patrons to more than meet expenses.

The petitioner says that if there was in fact a business slump during 1952–54, it makes no sense that film rentals increased during the same period, thereby further augmenting the losses of the exhibitors. Exhibits which were a part of the record on the original trial of this case showed that film rentals averaged about 33% during the period from 1946 to the summer of 1948 (when there was no competitive bidding). The petitioner's calculations for the period beginning February 1953 show averages of 40 to 44%. The petitioner has also figured a rental average of approximately 29% for the Fox Wisconsin and the Fox Palace during the period from June 1952 to February 1953 when the Towne was not included in competitive bidding. It is said that this figure illustrates what was thought to be a fair and reasonable rental when the defendants were not concerned with inflating rentals to injure the Towne.[4] But the comparison loses some force when it is seen that the Warner Theatre during the same period (June 1952 to February 1953) paid rentals of 45%, a figure higher

than that paid when it was bidding against the Towne.

While it is not easy to understand the reasons for higher film rentals during the period when all the exhibitors participated in competitive bidding, especially in view of the losses incurred by all, one factor stands out and is clearly a partial explanation. That is the competition created by the Riverside Theatre which, like the Towne, is an independent. The record fairly supports the conclusion that the Riverside was setting the competitive pace in 1952–54. Time after time it bid higher flat guarantees than the other theatres (a majority of its bids included a guarantee) and was usually successful in obtaining the picture. The policy apparently paid off because of the 42 highest grossing pictures during 1952–54 the Riverside played over 50%, and it appears that it obtained most of them by bidding a higher guarantee. Moreover, these were the pictures which, with a few exceptions, realized a profit for the exhibitor. There were of course many other films for which high bids were made which did not realize a profit. It seems to the court that a good deal of the high bidding—which often proved to be overbidding—was attributable to an attempt to obtain the more desirable films which might attract enough patrons to earn a profit and help overcome the deficit on less attractive pictures which would not earn a profit no matter how low the rental was. Not infrequently the exhibitor found himself with a high rental commitment and a film that did not live up to expectations. On one apparently outstanding film the Towne bid a guarantee of $20,000 which turned out to be 81% of gross box-office receipts. A few incidents like this would do a great deal toward raising the theatre's average film rentals under competitive bidding. It is probable that in some cases the exhibitors bid more for a picture than their sound business

4. It is not explained why the 29% price is any more fair then the 33% paid by the defendant exhibitors during another period when they were not bidding against the Towne.

judgment dictated; in others, they badly misjudged the film's potential. The competition was rugged, perhaps unnecessarily destructive, but it does not appear contrived. A persuasive indication of this was that the Riverside, an independent, came out on top. Its weekly average admissions of $11,036 were considerably higher than those of any other theatre, and despite high bids it was the only theatre to operate at a profit (including the income from vending operations; excluding that income it showed a fairly small loss).

The petitioner also attributes high film rentals to specific activities of the distributors in pursuance of their general plan. It alleges that in many cases the distributors, when submitting bids, required a stated guarantee or minimum percentage terms. No evidence was introduced to support this allegation. Petitioner also points to the practice of rejecting all bids on some films and thereafter licensing the film on negotiated terms as another method of inflating prices. The court has not analyzed each such incident to see whether the negotiated price was much higher than the bid price. In some instances the two do not appear to differ much; in others, unquestionably the negotiated price was higher. But it is not surprising to find the sellers (the distributors in this case) occasionally complaining that they are not being paid what the product is worth and attempting to obtain a higher price. Without more, there is nothing in the decree to forbid this. The petitioner does not claim that the rejection of bids was used as a method of discrimination against the Towne. And it is difficult to conclude that the practice was deliberately employed to force the Towne into uneconomic bids because some of the incidents occurred prior to February 1953 (when the Towne was being given first refusal and was not bidding for its pictures), and in a few of the cases after that date the only bidders were the Fox and Warner theatres. If the only purpose of rejecting bids and negotiating a license was to coerce excessive bids from the Towne, or both independents, it would be pointless to do it when the Fox and Warner theatres were only bidding against themselves.

It seems to the court that the most troublesome aspect of this case is the realization that if the defendants were still possessed of the monopolistic aim which they were found to have on the trial of this case, an effective, if temporarily costly, means of achieving it would be by bidding the Towne out of business. The petitioner sees that under competitive bidding it is paying unusually high film rentals and is operating at a continuous loss. It believes that it cannot long survive at this level. The petitioner has concluded that the situation disclosed by this record cannot be explained in any terms other than a deliberate scheme on the part of the defendants, and to some extent the petitioner relies upon the defendants' often adjudicated "proclivity for unlawful conduct". What the Master concluded, and what the court has attempted to demonstrate in somewhat different terms, is that the facts of record logically, and often clearly, support inferences and explanations entirely consistent with lawful conduct. Even if we were more in doubt, two important changes in the pattern of first-run exhibition in Milwaukee would require a cautious approach. The first, to which the court has already alluded, is the emergence of the Riverside, an independent, as a vigorous competitor for good films and for theatre patronage. Significantly, the Riverside has suffered less under competitive bidding than any of the other theatres. Secondly—and this cannot be ignored—the Fox and Warner theatres are no longer affiliated with the parent distributors who were the dominant personalities in the original conspiracy. There may be a tendency to bestow favors on old friends—and the distributors must be scrupulously careful to avoid this—but there is no evidence that the divorcement ordered by the Supreme Court has not been real.

This has eliminated a principal motive for the original conspiracy. The distributors no longer stand to gain directly by the success of the Fox and Warner theatres, and those theatres no longer have a protected market and source of supply. This is a very substantial change.

Taking into account all of the factors enumerated here, the court does not believe that it would be justified in holding that the defendants have utilized competitive bidding in a manner violative of the decree.

Up to this point the court has not adverted to the change in status of certain of the original defendants against whom the decree was entered. In view of the finding that no one has violated the decree, an extended discussion of this issue is unnecessary.

Briefly summarized, the changes are these. Twentieth Century-Fox Film Corporation (a New York corporation), a defendant, was dissolved in 1952. Its distribution business was transferred to a new corporation, Twentieth Century-Fox Film Corporation (a Delaware corporation), and its exhibition business was transferred to National Theatres, Inc., a new corporation, which through subsidiaries now operates the "Fox" theatres in Milwaukee. Paramount Pictures, Inc., a defendant, was dissolved and its distribution business was transferred to Paramount Pictures Corporation, a new corporation, which through subsidiaries distributes Paramount films in Milwaukee. In addition, two of the original Warner defendants have changed their names and rearranged their parentage, but apparently they do not claim that they are no longer the same companies and thus not subject to the decree. The Warner exhibition business, however, is now divorced from the Warner distribution business, which is represented in this case by Warner Bros. Pictures Distributing Corporation, a defendant.

With respect to the dissolved corporations, there is no real problem. If they are in fact not transacting business, clearly they would not be found to have violated this decree in their own name now or at any time in the future.

The Fox (Delaware) corporation, which acquired the distribution assets of Fox (New York), the defendant in this case, earnestly urges that the court include in its order a finding that it, Fox (Delaware), is not subject to the decree and that the use of the term "successor companies" in the decree does not extend the operation of the decree to it. These findings will not be entered, and insofar as they were included in the Master's report, they should be eliminated. Such findings are not necessary in view of the holding that no violation of the decree has been established, and they might be subject to misinterpretation in subsequent or related proceedings.

It is evident that the word "successors" was included in the original decree for the specific purpose of encompassing these new corporations. The decree was entered in 1950 after the Paramount decision, in directing divorcement of exhibition from production and distribution, had made clear that there would be considerable changes in corporate organization. See United States v. Paramount Pictures, Inc., 1948, 334 U.S. 331, 68 S.Ct. 915, 92 L.Ed. 1260, and D.C.S.D.N.Y.1949, 85 F.Supp. 881. The decree was framed to attempt to meet the situation created by these imminent changes. From the legal authorities cited by Fox (Delaware), however, it appears that a successor company cannot be bound by an injunctive decree solely by reason of the fact that the decree purports to extend to successors. It is conceded that if Fox (Delaware) aided or abetted any of the defendants—and not just the original Fox defendant—in violating the decree, it could be held in contempt under the general equitable principles expressed in Rule 65(d) of the Federal Rules of Civil Procedure. Fox (Delaware) says that it is nonetheless important to

it to have a finding that it is not a party to the decree because its obligation to comply would be different. As a nonparty it can be held in contempt only if it aids another defendant in an act of that defendant, but it cannot be held in contempt for its own independent acts.

In the first place, it seems to the court that the question is largely academic under a decree of this kind. The principal force of the decree is directed against cooperative or conspiratorial action on the part of the defendants. The decree does forbid certain acts by any of the defendants individually. But, as this proceeding shows, almost any activity of which the plaintiff might complain will be group activity, whether the conspiratorial element is shown by direct evidence or is to be implied. It is difficult for the court to conceive of any circumstance in which an act of Fox (Delaware) could not be shown to have aided party-defendants in a violation of the decree. If the petitioner's evidence in this proceeding had supported the charge, we would have no difficulty in holding Fox (Delaware) in contempt—assuming that it had been properly named a respondent. Thus, for all practical purposes, a finding that Fox (Delaware) is not a party would not appreciably lessen its obligations to respect the decree.

■ Moreover, it is not entirely clear that Fox (Delaware) might not be liable for its own acts. If it were true that a corporation (or person) could never be held unless it aided a party-defendant to the original decree in an act of that defendant, it would not be possible to enforce compliance in cases where the party-defendant had been dissolved even though its business was still being conducted by a "successor". That this may be done in some circumstances is the clear import of Southport Petroleum Co. v. N. L. R. B., 1942, 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718. The later case of Regal Knitwear Co. v. N. L. R. B., 1945, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661, did not modify Southport in this respect. As the Court said in the Regal case, the liability of a successor in a contempt depends on an appraisal of its relations and behavior. Judge Hand described it in terms of the legal identification of the non-party with the defendant. Alemite Mfg. Corp. v. Staff, 2 Cir., 1930, 42 F.2d 832, 833. And see United States v. Dean Rubber Mfg. Co., D.C. W.D.Mo.1946, 71 F.Supp. 96. The question of whether there is such identification between the two Fox companies is better left to a concrete set of facts on which Fox (Delaware) has been found to have committed acts in violation of the decree.

Applying the court's conclusions to the findings of fact and conclusions of law entered by the Master in the light of the objections made thereto, the following modifications should be made:

Paragraph 4 of the findings of fact should be eliminated. The court believes that this finding—that respondents do not control the distribution of first-run films in Milwaukee—results from a special use of the word "control" and is not an accurate reflection of the record in this case.

In paragraphs 7, 8, 10 and 11 the phrase "petitioner has not produced any evidence" should be modified to read, "the evidence of record does not support the charge".

Paragraph 12, relating to the role of Fox (Delaware) should be eliminated as unnecessary.

Of the conclusions of law, paragraphs 5, 6 and 7, all of which refer to the two Fox companies, should be eliminated.

Except as indicated, the findings and conclusions of the Special Master will be adopted and the objections of the petitioner overruled.

■ Mr. James P. Carey, Jr., Special Master, has filed his motion for the allowance of fees for services rendered in this proceeding, and in his motion suggests that the sum of $15,000 represents fair and reasonable compensation for such services. Counsel for the respondents have agreed that the amount

requested by the Special Master is fair and reasonable; on the other hand, counsel for the petitioner has taken the position that the amount requested is excessive. After a consideration of the motion and the views of counsel, the court has concluded that the sum of $12,500 should be allowed as the total amount of fees to be paid to the Special Master, to be assessed as follows: two-thirds to be paid by the petitioner and one-third by the respondents.

Counsel for respondents will please submit a judgment order in accordance with the views of the court within one week from March 29, 1956.