**UNITED STATES of America**

v.

**TWENTIETH CENTURY–FOX FILM CORP., and Leila J. Goldstein, Defendants.**

**No. 88–CR–732 (ELP).**

United States District Court, S.D. New York.

Dec. 7, 1988.

---

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, Fred E. Haynes, Bernard M. Hollander, Ann Lea Harding, James Tierney, U.S. Dept. of Justice, Antitrust Div. Attys., Washington, D.C., for the U.S.

Williams & Connolly by William E. McDaniels, Steven R. Kuney, Washington, D.C., for Twentieth Century–Fox.

Nussbaum, Owen & Webster by Earl C. Dudley, Jr., Washington, D.C., for Leila J. Goldstein.

## AMENDED OPINION AND JUDGMENT

PALMIERI, District Judge.

The defendant Twentieth Century–Fox Film Corporation ("Fox") is a major producer and distributor of motion pictures. The defendant Leila J. Goldstein ("Goldstein") was employed by Fox at all relevant times as its branch manager for the rental and distribution of its films in an area described by it as the Indianapolis–Milwaukee–Minneapolis territory. Since 1951, Fox has been party to a consent decree of this Court entered in *United States v. Loew's Inc.,* 1950–1951 Trade Cas. (CCH) ¶ 62,861 (S.D. N.Y.1951). This decree followed in the aftermath of protracted litigation initiated by the Government in 1938 and commonly referred to as the Paramount case. It resulted from a public awareness of widespread illegal practices in the motion picture industry in violation of the Sherman Act[1].

The Supreme Court stated that these practices eliminated "the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators." *United States v. Paramount Pictures, Inc., et al.,* 334 U.S. 131, 154, 68 S.Ct. 915, 927, 92 L.Ed. 1260 (1948). Among the illegal practices in which these defendants were found to have engaged was that of block booking motion picture films. Under Part II of the Fox Consent decree headed "Price Fixing, Clearance and Master Agreements, Block Booking En-

1. *United States v. Paramount Pictures, Inc., et al.,* 66 F.Supp. 323 (S.D.N.Y.), *findings entered,* 70 F.Supp. 53 (S.D.N.Y.1946), *aff'd in part, rev'd in part and remanded,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), *on remand,* 85 F.Supp. 881 (S.D.N.Y.1949).

joined", there appears the following provision:

> The defendant-distributor Twentieth Century–Fox Film Corporation, its officers, agents, servants and employees and its subsidiaries and any successor in interest are each hereby enjoined:
>
> . . . .
>
> 7. From performing or entering into any license in which the right to exhibit one feature is conditioned upon the licensee's taking one or more other features. . . .
>
> Loew's Inc., supra, 1950–1951 Trade Cas. (CCH) ¶ 62,861, at 64,545–546.

The defendants Fox and Goldstein were indicted and charged with criminal contempt pursuant to 18 U.S.C. § 401(3)[2] for violating this injunctive provision. The case was tried to the Court without a jury[3] from November 15, 1988 to November 18, 1988 inclusive. This opinion and judgment sets forth the Court's final conclusions and its judgment that both the defendants Fox and Goldstein are guilty beyond a reasonable doubt of criminal contempt.

### The Elements of Criminal Contempt Here Involved

There are three elements, each of which we have found beyond a reasonable doubt with respect to each defendant:

1. That Section II(7) of the consent judgment enjoining Fox and its employees from the conditioned licensing or block booking of motion picture films is a clear and unambiguous order.
2. That each defendant had actual knowledge of this order.
3. That each defendant willfully violated this order.

With respect to elements 1 and 2, the evidence is overwhelming and indeed, not

**2.** Section 401 provides: "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as ... (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

**3.** In a pretrial opinion filed on November 10, 700 F.Supp. 1242 (1988), this Court denied Fox's motion for a jury trial and confirmed an oral ruling to the same effect made at the time of

seriously disputed. Both defendants were fully aware of Section II(7) of the Fox consent judgment. The injunctive provision in question is clear and unambiguous and no suggestion has been made that it lacks clarity or seeks to accomplish any other purpose except to forbid the illegal practice of licensing a film on condition the licensee take one or more other films—a practice known in the industry as block booking.

The entire trial hinged on the third element—whether each defendant willfully violated the order; and as to Fox, its role is necessarily and inescapably linked to that of Goldstein. This Court had occasion to rule on this matter in a pretrial opinion filed on November 10, 1988. Familiarity therewith is assumed. It is stated therein that:

> [I]n the context of a corporate defendant, a corporation can be held criminally liable for the conduct of its managerial employees acting within the scope of their authority, United States v. Koppers Co., 652 F.2d 290, 298 (2d Cir.), cert. denied, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981), even if such activities were against corporate policy or specific instructions. See United States v. Basic Constr. Co., 711 F.2d 570, 573 (4th Cir.), cert. denied, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983). Thus, proof beyond a reasonable doubt that a managerial employee of Fox willfully violated the consent decree while acting within the scope of his or her authority establishes all the necessary elements of criminal contempt against Fox.

### The Evidence of Conditioned Licensing in Violation of Section II(7) of the Fox Judgment

■ The Government called eight witnesses. Three of them, Gloria Fennessy,

arraignment. Although the defendant Goldstein demanded a jury trial when she entered her not guilty plea, the question was immediately resolved by the Government's agreement to treat her case as a petty offense and to refrain from seeking a penalty greater than six months imprisonment or a $5,000.00 fine. Bloom v. Illinois, 391 U.S. 194, 210, 88 S.Ct. 1477, 1486, 20 L.Ed.2d 522 (1968); see 18 U.S.C. § 3571(b).

Charles Larrain and Steven Friedlander, were Fox employees, and three of them, Michael VonderHaar, James Wilson and Stanley McCulloch, were engaged in the film booking business. The remaining two witnesses were Gary Goebels, a theatre owner who booked films for his theatres himself, and Richard Peterson, the President of a company which owned theatres and booked films through a booking agent.

Stanley McCulloch, a booking agent for thirty years, who booked for 21 theatres involving 54 screens in 1987, was a credible and impressive witness. He was asked only five questions on cross examination by counsel for Fox. He was not cross examined by counsel for Goldstein. His credibility was in no way impugned. The defendant Goldstein testified in her defense and called Fennessy, who had already testified in the Government's case, as her own witness. Both Goldstein and Fennessy were Fox employees.[4] The defendant Fox did not call any witnesses.

The evidence was clear and without dispute that Goldstein was at all relevant times a managerial employee, working within the scope of her authority for the exclusive benefit of Fox. There were numerous contradictions and inconsistencies between the testimony of Goldstein and that of the Government witnesses. To a lesser extent, the same occurred with respect to the testimony of Fennessy. To the extent that the testimony of Fennessy and Goldstein fails to corroborate that of the Government witnesses it is rejected as unpersuasive. Both sides submitted numerous exhibits which will be referred to below where necessary and which are accepted as persuasive to the extent they corroborate the Government witnesses and support the Government's exhibits.

On a number of occasions, Ms. Goldstein, in her capacity as branch manager of Fox's Minneapolis–Milwaukee–Indianapolis branch office, declined to license a film unless another, less desirable film[5] was licensed and played first. Furthermore, by explicit instructions and close supervision, Goldstein caused her subordinates to engage in block booking, and Goldstein was aware that her subordinates were engaging in this activity.

Specifically, as early as January 1985, Goldstein was instructing her subordinates to engage in conduct designed to evade the injunctive provisions of the decree. Friedlander, a sales trainee under Goldstein's supervision, testified that he was instructed in January of 1985 on how to license an undesirable film when he met resistance in licensing the film Johnny Dangerously. Friedlander testified that Goldstein told him he could license a less desirable film such as Johnny Dangerously by telling exhibitors that a more desirable film, such as Flamingo Kid, was not available at that time, or if the less desireable film was released by Fox first, that films were being licensed in the order of release. Friedlander also testified that if the films were already booked and if the first less desirable film was moved back in time, then the second film was also to be moved back so that the less desirable film always played first. Mr. Friedlander testified that he followed Ms. Goldstein's instructions by engaging in block booking.

Then, in an inter-office memorandum dated July 18, 1985 Goldstein informed her staff: "I do not want to see any COCOON dates in a town that does not have PRIZZI'S dated." The memorandum further advised that should an exhibitor accuse a

**4.** Goldstein has been employed by Fox since 1984 and has at all times during her employment held the position of branch manager. Goldstein had previously worked in both exhibition, as a representative of independent exhibitors, and in distribution, including employment by National General and Columbia Pictures as a branch manager. Goldstein testified that she has been in the motion picture business for almost 22 years. Fennessy has been employed by Fox for four years. She was hired by Fox as a booker, and became a sales representative in October, 1984, with responsibility for 400 to 500 theatres. Before that, Fennessy worked for Universal Pictures from 1970 to 1984.

**5.** The desirability of a film depends on many factors. For the purposes of these proceedings, however, it seems clear that the record of the film at the box office following its first release, is the gauge by which the demand for licenses by bookers and theatre owners is determined.

staff member of block booking, "[j]ust advise him you are selling the pictures in order of availability and PRIZZI'S was our first summer release." The Government is justified in pointing to this memorandum as illustrative of Goldstein's awareness of her block booking and of the necessity for meeting customer's complaints on this score by some flimsy excuse. It is indeed illustrative of a consciousness of guilt on Goldstein's part. Fennessy testified that she followed these instructions by requiring exhibitors to play Prizzi's Honor before Cocoon. Moreover, exhibitors who attempted to cancel Prizzi's Honor had to accept a new date for that film and their Cocoon date was moved back to ensure that Prizzi's Honor was played before Cocoon.

One month after the Cocoon–Prizzi's Honor memo was circulated, Gary Goebels, an independent theatre owner, was subjected to block booking on the films Aliens, Big Trouble in Little China, and Space Camp. Goebels testified that he was told by Fennessy that although there was an Aliens print available, he could not have it until he played Big Trouble and Space Camp. Mr. Goebels capitulated and played all three films.

What we have just said indicates that Ms. Goldstein had cultivated an environment of noncompliance with the decree at this branch office. Indeed, her staff clearly considered their actions to be in accord with Goldstein's explicit instructions, and yet in violation of the prohibition against block booking. Charles Larrain, a booker employed by Fox for the past 14 years, testified with respect to the Cocoon–Prizzi's Honor memo that he thought that "it was dumb to put something like that in writing." These incidents set the stage for the flagrant violations that occurred with respect to licensing of the films Mannequin and Black Widow.

In March of 1987, Goldstein assembled her staff and gave them instructions similar to those contained in the Cocoon–Prizzi's Honor memo. Fennessy testified that she was instructed to not accept any Mannequin dates unless Black Widow was dated to play first or the theatre had played the film Morning After. Moreover, if an exhibitor wished to redate Black Widow, then Mannequin was to be moved back so that Black Widow would always be played first. If an exhibitor wished to cancel Black Widow, Fennessy testified, then Mannequin would be cancelled as well. Similarly, Larraine testified that he was instructed at this meeting not to accept any cancellations of Black Widow dates, but rather to . refer the exhibitor wishing to cancel either to Fennessy or to Goldstein, and if an exhibitor requested to move Black Widow back in time, then Mannequin had to be moved back so that Black Widow would always be played first. Goldstein admits giving the substance of these instructions to her staff at this meeting.

Stanley McCulloch of Pridley, Minnesota, had extensive booking experience with Fox both with respect to important exhibition areas (key towns) and the smaller towns where the fewer screens and smaller populations make booking choices more delicate and more difficult. In March, 1987, McCulloch sought to book Mannequin in Fairbolt, Wahpeton and Paynesville, Wisconsin. He was told by Fennessy that he had to first play Black Widow (a picture that promised lesser returns). McCulloch thereupon insisted on talking to the head of the Fox office, the defendant Goldstein. He testified as follows with respect to his conversation with Goldstein:

A. I said, "Lee, you can't possibly be condoning a policy such as this, you're going to be in trouble. Do you mean to say you are telling me I have to play Black Widow before I play Mannequin?
"That's the way it is."

Q. Did she say anything else?

A. I hung up, I was totally shocked. Happened to me twice in my life in 30 years, 1978 and 1987.
I've never had the statement made to me that blatantly, "You must play this before you play that," and that's quite a shock.

Q. So you just hung up?

A. I hung up.

When McCulloch called back two days later, he spoke with Fennessy. McCulloch complained vehemently to her of the illegality of forcing him to play Black Widow before he could play Mannequin, reminded her he had been a witness against this practice before (McCulloch testified against Fox in a block booking case in 1978 involving Star Wars), that he was prepared to testify again, and warned Fennessy she was "going to be in bad trouble". Fennessy's answer was both cryptic and illuminating: "I only work here". One week later, because of the pressure of this policy and his need for films, McCulloch booked both Mannequin and Black Widow in three of his theatres. Subsequently, at a testimonial dinner for a Paramount executive, McCulloch sought out Goldstein, and repeated the same warnings to her and asked to book Mannequin at two small town theatres. Goldstein replied that he could have the booking for a $500 guarantee and 50 percent film rental—terms far more onerous than the usual $100 guarantee and 40 percent film rental—and which McCulloch characterized as "absolutely prohibitive".

The tactic of using oppressive terms as a means of avoiding a booking for a prospective customer resisting the block booking policy was repeated by Goldstein with respect to James Wilson. There can be no doubt that this was an enforcement tool for her policy to force exhibitors into block booking. Her quoting prohibitive terms was just another way of saying that if customers were unwilling to exhibit a film of her choice as a condition of the customer's getting a film he desired, the quotation of impossible terms for the desired film would force him to accept Goldstein's conditioned licensing policy.

James Wilson, another independent booker testified that he was told by both Fennessy and Goldstein that he would have to book Black Widow before he could book Mannequin. In four of his theatres, Wilson refused to book Black Widow, and in return Goldstein declined to give Wilson Mannequin dates for these theatres. Wilson testified that he told both Fennessy and Goldstein that their conduct with respect to Black Widow and Mannequin con-

stituted block booking and that it was illegal. Similarly, Michael VonderHaar, also an independent booker, testified that when he attempted to cancel Black Widow dates in some of his theatres, he was told by Fennessy that he had to play Black Widow to keep his Mannequin dates.

There can be no doubt that Goldstein flagrantly and repeatedly violated the decree in question with a full awareness of the significance of her actions and that she did so willfully.

### Cancellations

The necessity for a flexible policy of cancellation was much bruited by the defense at the trial. There can be no doubt that the average motion picture theatre operating on a Monday to Friday schedule requires some freedom of cancellation of licenses both by the distributor-licensor and the exhibitor-licensee. But a cancellation in the normal course of business for bona fide reasons is quite different from the illegal action of using a threat of cancellation of a desirable motion picture as a means of coercing acceptance of a license for a less desirable motion picture. So too, the policy of using the power of cancellation as a means of compelling the poorer picture to play before the desirable picture can be played is an illegal tactic and both these cancellation procedures are inconsonant with the policy of forbidding conditioned licenses. Goldstein and her staff did not hesitate to use both these tactics.

### Proof of Compliance

Something must be said of the attempt of Fox to comply with the decree. At the outset of these proceedings it was conceded by the Government that it did not contend for the purposes of this case, that Fox's block booking activity was company-wide or extended beyond the territory covered by the indictment. Additionally, every Fox employee who testified, including defendant Goldstein, admitted filing a written acknowledgment with Fox attesting to a knowledge of the injunctive provisions forbidding block booking, and signing an un-

dertaking to comply therewith. However, we have already ruled, notwithstanding Fox's argument to the contrary, that the "reasonable diligence" defense has no place in these proceedings. *See United States v. Twentieth Century–Fox Film Corporation,* 700 F.Supp. 1242, 1243–44 n. 1 (S.D.N.Y.1988). Having found beyond a reasonable doubt that Goldstein willfully violated the Fox consent decree, we need not go into the matter further on the issue of Fox's guilt.

## CONCLUSION

The Supreme Court stated in *United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), that "[s]entences for criminal contempt are punitive in their nature and are imposed for the purpose of vindicating the authority of the court", *id.* at 302, 67 S.Ct. at 700, and that "[t]he interests of orderly government demand that respect and compliance be given to orders issued by Courts possessed of jurisdiction of persons and subject matter." *Id.* at 303, 67 S.Ct. at 701.

No issue has been raised as to this Court's jurisdiction and it is clear that this Court has jurisdiction of the persons and subject matter of these proceedings. There has been sufficient evidence to establish beyond a reasonable doubt that the defendant Leila J. Goldstein willfully and repeatedly violated Section II of the Consent Judgment entered by this Court in *United States v. Paramount Pictures, Inc., et al.,* Equity No. 87–273, sub nom *United States v. Loew's Inc., et al.,* 1950–1951 Trade Cas. (CCH) ¶ 62,861 (S.D.N.Y. 1951), while acting within the scope of her employment as a branch manager for Twentieth Century–Fox Film Corporation and for its financial benefit. The records of this Court show that on September 12, 1978 the defendant Fox entered a plea of *nolo contendere* to a similar violation for block booking and was sentenced to pay a fine of $25,000 and to pay, in addition, the costs of prosecution, *see* 28 U.S.C. § 1918(b). There is evidence in the recent contempt proceeding before this Court from which the inference can be drawn

that the defendant Goldstein and her assistant Fennessy were advised of the 1978 contempt proceedings and appreciated their significance.

The defendants have been directed to appear on December 7, 1988 and sentences will be imposed at that time.